UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE

JENNIFER BYRUM, as the personal )
representative and next of kin of )
RICKY LYNN LEWIS, deceased, )
)
Plaintiff, )
)
v. ) No. 3:24-CV-239-TAV-JEM
)
KNOX COUNTY, TENNESSEE, )
SHERIFF TOM SPANGLER, CHIEF )
DEBBIE COX, CAPTAIN JOSH )
SMITH, CHIEF PAUL COOPER, )
JANE DOES 1 AND 2, and )
JOHN DOES 1–6, )
)
Defendants. )

## MEMORANDUM OPINION AND ORDER

Proceeding through counsel, Plaintiff Jennifer Byrum ("Plaintiff") filed this action for relief under 42 U.S.C. § 1983 and state law following the death of her father, Ricky Lynn Lewis ("Lewis"), who died of a drug overdose approximately 24 hours after he entered the Roger D. Wilson Detention Facility ("Facility") [Docs. 1, 10].  Now before the Court are Knox County's (1) motion to dismiss this Defendant and all official capacity claims [Doc. 12]; (2) motion to stay discovery pending disposition of the motion to dismiss [Doc. 22]; (3) motion for leave to file a reply to Plaintiff's response to the Court's show cause order [Doc. 31]; (4) motion to enforce the parties' stipulation and agreement [Doc.

32]; and (5) motion for sanctions[1] [Doc. 39].  Also before the Court are Plaintiff's motion for an extension of time to file a response to the motion for sanctions [Doc. 41] and motion to dismiss the individual Defendants without prejudice [Doc. 44].  The Court will address these motions in turn.

## I.     MOTIONS FOR LEAVE AND EXTENSION

For good cause shown therein and due to the lack of any opposition thereto, Knox County's motion for leave to file a reply to Plaintiff's response to the Court's show cause order [Doc. 31] is **GRANTED**, and Court will consider Knox County's reply [Doc. 40] in resolving this issue.

Also, due to the lack of any opposition thereto, Plaintiff's motion for extension of time to file a response to the motion for sanctions [Doc. 41] is **GRANTED**, and the Court will consider plaintiff's response [Doc. 42].

## II.     NAMED INDIVIDUAL DEFENDANTS

In various filings before the Court, the parties disagree about whether Plaintiff should be allowed to pursue claims against and/or voluntarily dismiss without prejudice her claims against Sheriff Tom Spangler, Chief Debbie Cox, Captain Josh Smith, and Chief Paul Cooper in their individual capacities where (1) the parties previously filed a stipulation indicating that these Defendants were sued only in their official capacities [Docs. 3, 30, 32, 35, 36, 40, 44, 45], and (2) Knox County has filed a motion requesting sanctions based on

---

[1] While the Court's docket indicates that the named individual Defendants filed the motion for sanctions, it is apparent from the title and substance of the motion for sanctions that Knox County filed it [Doc. 39].

2

the events surrounding this dispute [Docs. 39, 42, 43]. The Court will explain the relevant procedural history of these disputes before addressing them on the merits.

## A. Procedural Background

Plaintiff initiated this action by filing a complaint for violation of § 1983, which arises out of May 25, 2023, events during Lewis's incarceration in the Facility, against Knox County, Knox County Mayor Glenn Jacobs, Sheriff Tom Spangler, Chief Debbie Cox, Captain Josh Smith, Chief Paul Cooper, and John and Jane Does through Attorneys Ursula Bailey and Dan Stanley [Doc. 1]. In her original complaint, Plaintiff included three numbered sections regarding municipal liability [*Id.* at 7–15], one claim for "unnecessary force" against the Doe Defendants in their individual capacities [*Id.* at 15–16][2], and state law claims for negligence and negligence per se against all Defendants [*Id.* at 16–17].

The day after she filed her original complaint, Plaintiff issued summonses for Knox County, Mayor Jacobs, Sheriff Spangler, Chief Cox, Captain Smith, and Chief Cooper [Doc. 2]. Subsequently, however, on June 25, 2024, the parties filed a stipulation indicating in relevant part that (1) "[D]efendants Knox County Mayor Glenn Thomas Jacobs, Sheriff Tom Spangler, Chief Debbie Cox, Captain Josh Smith, and Chief Paul Cooper (all named defendants) are sued in their official capacities only"; and (2) "Knox County and the [D]efendants sued in their official capacities have been properly served with process" [Doc. 3]. The Court has reviewed the docket and has not found any

---

[2] While this claim is split into two sections, these sections taken together appear to allege only an excessive force claim against the Doe Defendants in their individual capacities [*Id.*].

3

document indicating Plaintiff properly served the individual Defendants with her original complaint.

On September 16, 2024, Attorney Richard Collins filed an appearance on behalf of Plaintiff [Doc. 8] as well as a joint motion to amend stipulations from the parties (but not the official capacity stipulation [Doc. 3] described above) and to extend the deadline for Plaintiff to amend her complaint [Doc. 9].

On October 1, 2024, Plaintiff filed an amended complaint naming Knox County, Sheriff Spangler, Chief Cox, Captain Smith, and Chief Cooper as defendants [Doc. 10]. Unlike the original complaint, the amended complaint includes a claim against Sheriff Spangler, Chief Cox, Captain Smith, and Chief Cooper in their individual capacities [*Id.* at 10–11] before again including three numbered sections of municipal liability allegations [*Id.* at 11–18], one claim for "unreasonable use of force" against the Doe Defendants in their individual capacities [*Id.* at 18–19], and state law claims for negligence and negligence per se against all Defendants [*Id.* at 19–20]. Nothing in the record suggests Plaintiff ever served her amended complaint on any individual Defendants.

The Court then entered an order requiring Plaintiff to provide evidence that she served the individual Defendants with her amended complaint in compliance with Rule 4 of the Federal Rules of Civil Procedure or otherwise show good cause why service has not been made [Doc. 29]. Plaintiff, through Attorney Collins, filed a timely response to this order indicating that, despite the parties' earlier stipulation that the individual Defendants named in the original complaint were sued only in their official capacities [Doc. 3], he did not view that to be the case as to Sheriff Spangler, Chief Cox, Captain Smith, and Chief

4

Cooper, whom he believed had been sued under a theory of "'supervisory liability' under § 1983," and he had communicated that belief to Defendants' counsel [Doc. 30, p. 2]. Plaintiff states that she therefore did not issue service of process for the individual Defendants when she filed her amended complaint because, in her view, all individual Defendants were already properly served, counsel had appeared on their behalf, and service of the amended complaint through the Court's CM/ECF system was therefore complete under Rule 5 of the Federal Rules of Civil Procedure [*Id.*]. Plaintiff further claims that the individual Defendants waived any service of process defense by failing to raise it in a responsive pleading [*Id.* at 2–3] before arguing that, even if she is wrong about the status of service on the named individual Defendants, that should not result in dismissal, as the confusion was created by the parties' stipulation, and the parties are equally at fault [*Id.* at 3].

Knox County then filed a motion to enforce the parties' stipulation and agreement [Doc. 32]. In this motion, Knox County asserts that its attorneys did not have any notice that the individual Defendants were sued in their individual capacities, that its attorneys have not appeared on behalf of any individual Defendants in their individual capacities, and that counsel for Plaintiff was aware of counsel for Knox County's representation of the individual defendants only in their official capacities and took no steps to clarify the record or seek relief from the stipulation [*Id.* at 1–5].

In support of this last assertion, Knox County attached an email exchange its counsel had with the Clerk of this Court on February 12, 2025, in which its counsel explained his position that no attorney had appeared in this case on behalf of the named Defendants in

5

their individual capacities because (1) no service of process had been served on them; and (2) the parties had stipulated that these Defendants were sued in their official capacities only [Doc. 32-1, pp. 1–2]. While it is unclear who all was included on Knox County's counsel's email explaining this rationale, it is apparent that Attorney Collins received it, as he responded to that email on the same day by stating "Thanks for this information David. We will be in touch," and this response email was copied to all attorneys who have appeared in this case [*Id.* at 1].

Knox County further points out that Plaintiff has not filed proof of service of process on the individual Defendants or cited any document in the record indicating that counsel has appeared for the individual Defendants, and that Rule 12 therefore does not support Plaintiff's argument that these Defendants have waived the defense of service of process [Doc. 32, pp. 5–6]. Knox County also asserts that the Court should enforce the stipulation based on the "course of proceedings" doctrine [*Id.* at 7–9] before additionally arguing that Plaintiff should not be able pursue her amended complaint claims against the individual Defendants in their individual capacities, as such claims are untimely [*Id.* at 9–10]. Knox County also filed a reply to Plaintiff's response to the Court's show cause order incorporating its arguments and assertions from its motion to enforce the stipulation and agreement [Doc. 33].

Plaintiff filed a response in opposition to Knox County's motion to enforce the stipulation and agreement [Doc. 35]. In this response, Plaintiff first notes that summonses for the individual Defendants were issued before asserting that the stipulation regarding the named individual Defendants being sued in their official capacity only was the product

6

of Attorney Bailey speaking with a lawyer for Knox County about service of process and extending the time for Defendants to file a response to the original complaint [*Id.* at 1–2]. But according to Plaintiff, Attorney Bailey does not recall stating that the named individual Defendants were sued in their official capacities only, nor did she find an email about this issue with counsel for Knox County in a "reasonably diligent search" [*Id.* at 2]. Plaintiff also states that the Court should not enforce the stipulation under contract law, as Attorney Bailey did not intend to agree to the stipulation [*Id.* at 3]. In support of these assertions, Plaintiff filed an affidavit from Attorney Bailey [Doc. 35-1].

However, Knox County then filed a notice attaching an email in which counsel for this Defendant requested and received approval from Attorney Bailey to file the stipulation that the named individual Defendants were sued in their official capacities only [Doc. 3], on which Attorney Stanley was also copied [Docs. 36, 36-1]. Knox County additionally filed a motion seeking sanctions and an evidentiary hearing regarding Plaintiff's allegations about the stipulation in which it summarizes its version of the events underlying this issue [Doc. 39], as well as a reply to Plaintiff's response to its motion for sanctions incorporating the motion for sanctions [Doc. 40].

Plaintiff filed a response to the motion for sanctions [Doc. 42]. In this response, Plaintiff asserts that Attorney Bailey was busy when she agreed to the stipulation, which Plaintiff now states was improper, as the rules do not allow it [*Id.* at 1]. Plaintiff also claims to have offered to resolve this issue with counsel for Knox County through voluntary dismissal without prejudice, which she claims Knox County's counsel unreasonably rejected [*Id.* at 2].

Knox County filed a reply to this response reiterating its narrative of the relevant facts and asserting that those facts raise a number of questions about Plaintiff's attorneys' acts and omissions and attaching the relevant email exchange in which Plaintiff's counsel proposed voluntary dismissal of the named individual Defendants, to which counsel for Knox County responded by stating they "respectfully decline[d]" [Docs. 43, 43-1].

Plaintiff then filed a motion to dismiss the individual Defendants without prejudice based in relevant part on her assertions that "the controversy that has erupted over whether said [D]efendants are properly sued in their personal capacities has gone too far, and the time and resources the parties and Court are devoting to this issue is disproportionate to the needs of this case," that her amended complaint focuses mainly on claims against Knox County, and that "if discovery reveals a very compelling case against [the named individual Defendants], Plaintiff should be permitted to pursue those claims" [Doc. 44]. Knox County filed a response in opposition to this motion indicating that dismissal of the named individual Defendants should be with prejudice based on the allegations in its motion for sanctions [Doc. 45].

## B.     Analysis

Notably, as set forth above, Plaintiff has now filed a motion to dismiss her claims against the named individual Defendants without prejudice [Doc. 44]. But given Knox County's opposition to that request and assertion that this dismissal should be with prejudice based on its motion for sanctions [Doc. 45], the allegations in Knox County's motion for sanctions [Doc. 39], and Plaintiff's statement in her motion to dismiss indicating that she should be allowed to pursue individual capacity claims in the future if discovery

8

so indicates [Doc. 44, pp. 1–2], the Court will now examine whether Rule 4(m) permits Plaintiff additional time (now or in the future) to serve the named individual Defendants with service of the amended complaint, as well as the parties' related motions [Docs. 39, 44].

Under Rule 4(m), a plaintiff must serve a defendant within 90 days after filing the complaint, and if the plaintiff fails to do so, the Court must dismiss the action without prejudice against that Defendant unless the plaintiff shows good cause for the lack of timely service. "The plaintiff has the burden of establishing that proper service of process has occurred." *Thul v. Haaland*, No. 1:20-CV-354, 2022 WL 20728031, at *2 (E.D. Tenn. Mar. 24, 2022), *aff'd*, No. 22-5440, 2023 WL 6470733 (6th Cir. Mar. 1, 2023) (citing *Shires v. Magnavox Co.*, 74 F.R.D. 373, 377 (E.D. Tenn. 1977)).

Rule 4(m)'s requirement that a plaintiff who has failed to obtain timely service on a defendant show "good cause" for that omission generally means the plaintiff must show "a reasonable, diligent effort" at proper service. *Johnson v. Smith*, 835 F. App'x 114, 115 (6th Cir. 2021) (internal quotation omitted). "[C]ounsel's inadvertent failure or half-hearted efforts to serve a defendant within the statutory period does not constitute good cause." *Friedman v. Est. of Presser*, 929 F.2d 1151, 1157 (6th Cir. 1991) (collecting cases). However, good cause may exist when "something outside the plaintiff's control prevents timely service." *Savoie v. City of E. Lansing*, No. 21-2684, 2022 WL 3643339, at *4 (6th Cir. Aug. 24, 2022); *see also Friedman*, 929 F.2d at 1157 (finding good cause "when the defendant intentionally evades service of process").

9

Also, if the plaintiff does not show good cause for a failure to timely serve a defendant, the Court may still grant the plaintiff time to do so after considering the following factors:

> (1) whether an extension of time would be well beyond the timely service of process; (2) whether an extension of time would prejudice the defendant other than the inherent prejudice in having to defend the suit; (3) whether the defendant had actual notice of the lawsuit; (4) whether the court's refusal to extend time for service substantially prejudices the plaintiff, i.e., would the plaintiff's lawsuit be time-barred; (5) whether the plaintiff had made any good faith efforts to effect proper service of process or was diligent in correcting any deficiencies; (6) whether the plaintiff is a pro se litigant deserving of additional latitude to correct defects in service of process; and (7) whether any equitable factors exist that might be relevant to the unique circumstances of the case.

*Staub v. Nietzel*, No. 22-5384, 2023 WL 3059081, at *10 (6th Cir. Apr. 24, 2023) (quoting *United States v. Oakland Physicians Med. Ctr.*, 44 F.4th 565, 569 (6th Cir. 2022)).

Plaintiff has not established that she served the named individual Defendants with her amended complaint in this action within 90 days of filing that complaint. Plaintiff also has not shown good cause for her failure to serve the individual Defendants with her amended complaint, nor do the relevant factors weigh in favor of the Court allowing her to do so now.

As set forth above, Plaintiff filed her amended complaint on October 1, 2024 [Doc. 10]. Thus, Rule 4(m) provided Plaintiff up to and including December 31, 2024, to serve her amended complaint on all Defendants. But even though the amended complaint purports to sue the named individual Defendants in their individual capacities [*Id.* at 9–11], nothing in the record indicates Plaintiff has ever attempted to serve the amended complaint on the individual Defendants.

10

Plaintiff seeks to establish good cause for her failure to serve the named individual Defendants with her amended complaint based on two arguments, neither of which is persuasive. First, Plaintiff claims that Attorney Collins believed that the original complaint sued Sheriff Spangler, Chief Cox, Captain Smith, and Chief Cooper under a theory of "'supervisory liability' under § 1983" and communicated that belief to Defendants' counsel, and that she therefore believed the counsel had appeared for all named individual Defendants, such that service of her amended complaint through the Court's electronic case management system was proper under Rule 5 [Doc. 30, p. 2]. But the record contradicts Attorney Collins's ostensible beliefs that the original complaint sued all named individual Defendants (except the Knox County Mayor) in their individual capacities and that these individual Defendants were properly served with process and represented by counsel. Specifically, the record establishes that soon after Plaintiff filed her original complaint, the parties filed a stipulation stating that Plaintiff had sued the named individual Defendants in their official capacities only, and counsel for Knox County therefore stipulated to service of process for Knox County and the individual Defendants in their official capacities only [Doc. 3]. As such, Attorney Collins's supposed beliefs regarding supervisory liability claims against the relevant named individual Defendants in their individual capacities and/or representation of the named individual Defendants by Knox County's counsel in their individual capacities do not establish good cause for Plaintiff's failure to serve the named individual Defendants with her amended complaint.

Plaintiff next attempts to establish good cause for her failure to timely serve the named individual Defendants with her amended complaint by stating Attorney Bailey did

not intend to agree to and/or failed to carefully read the stipulation stating that these Defendants were sued only in their official capacities prior to agreeing that counsel for Knox County could file that stipulation with the Court [Docs. 35, 35-1, 42]. However, this argument also has no merit. Specifically, both Attorney Bailey and Attorney Stanley represented Plaintiff when Attorney Bailey agreed that Knox County could file the official capacity stipulation in this case, and the record indicates that both of those attorneys were on the emails regarding Attorney Bailey's agreement to that stipulation [Doc. 1, p. 18; Doc. 3; Doc. 36-1]. And nothing in the record indicates that Attorney Stanley did not carefully read or understand the official capacity stipulation before or after Knox County filed that stipulation in the record. Nor has Plaintiff cited any case indicating that her attorneys' apparent failure to read or comprehend the stipulation before or after it was filed are good cause to excuse a lack of timely service under Rule 4(m).

Additionally, and even more notably, three attorneys represented Plaintiff for the more than eight months after she filed her amended complaint and before the Court entered its show cause order regarding service of the amended complaint, but Plaintiff still never (1) attempted to serve that amended complaint on any individual Defendants; or (2) challenged or sought relief from the official capacity stipulation. These omissions are even more notable because the record establishes that on February 12, 2025 (which is nearly five months after Attorney Collins joined in Attorneys Bailey and Stanley's representation of Plaintiff, more than four months after Plaintiff filed her amended complaint, and almost four months before the Court filed its show cause order), counsel for Knox County fully explained his position that Knox County's counsel only represented

Knox County and the official capacity claims against the individual Defendants in an email exchange with the Clerk of this Court, to which Attorney Collins responded by indicating his appreciation for the explanation and that he would reach out about the issue [Doc. 32-1].

Accordingly, Plaintiff has not shown good cause for her failure to timely serve the individual Defendants with the amended complaint under Rule 4(m). Thus, the Court will now examine whether it should now allow Plaintiff additional time to do so based on the relevant factors listed above. For the reasons set forth below, the Court finds that these factors weigh against allowing Plaintiff more time to serve the individual Defendants.

First, allowing an extension of time for Plaintiff to serve the named individual Defendants at this time would be well beyond the applicable Rule 4(m) deadline. Specifically, as set forth above, Rule 4(m) provided Plaintiff up to and including December 31, 2024, to serve her amended complaint on all Defendants. As of the date of the filing of this memorandum opinion and order, it is over eight months past December 31, 2024. And, as to the second factor, it is not clear whether an extension of time would prejudice the named individual defendants, other than the inherent prejudice in having to defend this action. As to the third factor, even if the Court assumes that the individual Defendants knew of this lawsuit soon after Plaintiff filed her original complaint, it is apparent that, due to the nature of that complaint [Doc. 1] and the parties' relevant stipulation [Doc. 3], those Defendants would not have had any notice that Plaintiff asserted that they had any individual liability for Plaintiff's claims.

As to the fourth factor regarding prejudice to the plaintiff from a failure to allow late service of process, Plaintiff filed her amended complaint on October 1, 2024 [Doc. 10,

13

p. 22], which is nearly 16 months after the May 25, 2023, events underlying that complaint [*See generally id.*]. Thus, Plaintiff filed her amended complaint after Tennessee's one-year statute of limitations, which applies in this case, expired. *Harris v. United States*, 422 F.3d 322, 331 (6th Cir. 2005); Tenn. Code Ann. § 28-3-104(a)(3). And Plaintiff's attempt to amend her complaint to assert individual capacity claims against the named individual Defendants would not relate back to the date on which Plaintiff filed her original complaint under the applicable "course of proceedings" test, as (1) her original complaint, read as a whole, did not provide the named individual Defendants fair notice they were sued in their individual capacities [Doc. 1]; and (2) the stipulation the parties filed soon after Plaintiff filed her original complaint clearly established that Plaintiff sued Defendants only in their official capacities. *Moore v. City of Harriman*, 272 F. 3d 769, 772 (6th Cir. 2001) (providing that the relevant consideration for whether a plaintiff's amendment of a complaint to sue a defendant in his individual rather than official capacity relates back to the date on which the plaintiff filed her previous complaint is whether the course of proceedings fairly provided defendant with notice that he was sued in his individual capacity, and that a court can examine the parties' subsequent filings to make this determination where the complaint was unclear (citing *Abdur-Rahman v. Mich. Dep't. of Corr.*, 65 F.3d 489, 491 (6th Cir. 1995) and *Pelfrey v. Chambers*, 43 F.3d 1034, 1037–38 (6th Cir. 1995))).

As to the fifth and sixth factors, Plaintiff has not alleged or set forth anything from which the Court can plausibly infer that she or her attorneys made any effort to properly serve the individual Defendants with her amended complaint. And as to the seventh factor,

the Court is unaware of any equitable factors that would warrant the Court allowing Plaintiff to serve the individual Defendants with her amended complaint at this time.

Thus, the Court will not allow Plaintiff additional time to serve her amended complaint on the named individual Defendants under Rule 4(m), and Plaintiff's claim(s) in her amended complaint against these Defendants in their individual capacities are therefore **DISMISSED without prejudice**. As this determination resolves the main substance of Knox County's motion to enforce the stipulation and agreement [Doc. 32] and Plaintiff's motion to dismiss [Doc. 44], these motions are **DENIED as moot**.

This leaves the Court to address Knox County's motion for sanctions [Doc. 39]. In this motion, Knox County requests that the Court sanction Plaintiff's attorneys because their acts and omissions related to the parties' dispute over the amended complaint's individual capacity claims against the named individual Defendants violated the professional conduct standards, specifically alleging that Plaintiff's attorneys have failed to use candor towards this Court and/or acted in ways that were dishonest, fraudulent, deceitful, and/or misrepresentative of the facts [*Id.* at 1–2]. In support of the request for sanctions, Knox County cites *Chambers v. NASCO, Inc.*, 501 U.S. 32, 43 (1991), 28 U.S.C. § 1927, and 42 U.S.C. § 1988(b) [*Id.* at 2–4]. Knox County also requests an evidentiary hearing to ask Plaintiff's attorneys about their acts and omissions in this dispute [*Id.* at 4–6]. Plaintiff's response in opposition to this motion alleges that this controversy essentially boils down to (1) Attorney Bailey being busy when she agreed to the stipulation; (2) Attorney Collins pushing the issue further than he would have if he had realized this; and (3) "bluster" on the part of counsel for Knox County [Doc. 42, pp. 1–2].

15

Under 28 U.S.C. § 1927, any party who "multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." Courts also have the inherent authority to sanction bad faith conduct in litigation. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 49 (1991). Additionally, under 42 U.S.C. § 1988(b) and (c), a district court may, in the exercise of its discretion, award attorney and expert fees to a prevailing party.[3] This includes a prevailing § 1983 defendant "where no evidence supports the plaintiff's position or the defects in the suit are of such magnitude that the plaintiff's ultimate failure is clearly apparent from the beginning, or at some significant point in the proceedings after which the plaintiff continues to litigate." *Wolfe v. Perry*, 412 F.3d 707, 720 (6th Cir. 2005) (citation omitted).

The Court recognizes Knox County's argument regarding the manner in which the parties' dispute over Plaintiff's attempts to assert individual liability claims against the named individual Defendants in her amended complaint proceeded. The Court further notes that, given the totality of the circumstances surrounding this dispute that the Court summarized above, it is unclear why Plaintiff's attorneys pursued this avenue for as long as they did. Nonetheless, the Court declines to find that it was so unreasonable as to be vexatious or in bad faith.

Accordingly, Knox County's motion for sanctions and for an evidentiary hearing [Doc. 39] is **DENIED**.

---

[3] Neither party addresses whether Defendant Knox County qualifies as a "prevailing party" under this statute. Accordingly, the Court makes no finding regarding this issue.

16

## III. MOTION TO DISMISS

Knox County filed a motion to dismiss the amended complaint claims against this Defendant and the individual Defendants in their official capacities [Doc. 12], and Plaintiff filed a response in opposition [Doc. 18]. The Court will summarize the factual allegations and relevant legal claims in the amended complaint before setting forth the applicable standard and addressing this motion on the merits.

### A. Amended Complaint Allegations

#### 1. Factual Summary

In her amended complaint, Plaintiff states in relevant part that Lewis was arrested after calling police to request assistance with getting his truck back from someone who had taken it without his consent because he was intoxicated, "behaving erratically," and admitted to using methamphetamine, and police officers determined that Lewis "posed a direct potential danger to himself and others" [Doc. 10, pp. 3–4]. Lewis arrived in the Facility's sally port at approximately 5:02 a.m., and Plaintiff claims that surveillance footage from this area shows he "was unstable on his feet and hunched over" while officers processed him into the Facility [*Id.* at 4].

Also, according to Plaintiff, the Tennessee Corrections Institute ("TCI") establishes minimum standards for the Facility, and one of those standards provides that "Booking" includes "searching, fingerprinting, photographing, medical screening, and collecting personal history data" [*Id.*]. Plaintiff also asserts that the medical screening included in the booking process (1) is "to prevent newly arrived offenders who pose a health and safety threat to themselves or others from being admitted to the general population and to identify

17

offenders who require immediate medical attention" and (2) can be initiated at the time of admission by health care personnel or by a health-trained correctional officer [*Id.*]. But Plaintiff states that, upon her information and belief, Lewis did not receive a medical screening during his booking into the Facility [*Id.* at 5].

Plaintiff further avers that Lewis could not walk when he was processed into the Facility, and that officers therefore pushed him in a wheelchair and at some point left him "lying on a bench unconscious" [*Id.*]. Plaintiff also claims that while Facility officials took Lewis's vital signs, a Jane Doe Defendant used her knuckles to do a "sternum rub" on Lewis, which is a "technique . . . commonly used by first responders to stimulate individuals suspected of an opioid overdose" [*Id.*]. According to Plaintiff, the sternum rub woke Lewis, but he "continued to drift in and out of consciousness" and "was clearly in the throes of an overdose or acute drug withdrawal, and even a layperson would recognize the need to have Lewis transported to a hospital" [*Id.*]. And even though "[n]aloxone is approved by the Food and Drug Administration and has been used for decades by first responders to reverse opioid overdose [and] [i]t is common knowledge that naloxone should be administered to anyone who presents with signs of opioid overdose or when opioid overdose is suspected," Doe Defendants did not give Lewis naloxone and instead used smelling salts to keep him awake while they took his vital signs [*Id.* at 5–6]. Plaintiff also states that a Doe Defendant then made a joke about Lewis's condition and accused him of "playing games" and "acting up" before a Doe Defendant and another correctional officer put Lewis in a holding cell [*Id.* at 6].

Plaintiff further asserts that "whether due to inadequate training, lack of supervision, or sheer indifference," various John and Jane Doe Defendants and others "failed to take any reasonable measure to abate" unspecified risks and "locked Lewis in a holding cell for 'observation[]' then turned a blind eye to what was to follow" [*Id.*]. According to Plaintiff, Lewis entered the observation cell at 6:48 a.m. and remained there for nine hours [*Id.*].

Plaintiff asserts that after Lewis entered the observation cell, he was "writhing in pain" for several hours, but no officer or medical provider entered the cell to check on him, although one officer dropped off a bag of food approximately four hours into this confinement [*Id.* at 6–7]. Plaintiff further states that, about five hours into Lewis's holding cell confinement, he urinated on himself before defecating uncontrollably [*Id.* at 7]. Lewis then removed his clothing but "was covered in his own excrement," a picture of which Plaintiff includes in her complaint [*Id.*]. Plaintiff further alleges that Lewis then spent three and a half hours "convulsing on the ground in his own feces" before he lifted himself to the window and appeared to scream for help [*Id.*]. Officers entered the cell approximately 45 minutes later, at about 3:42 p.m. [*Id.*].

As the officers took Lewis to the shower, he "mumbl[ed] incoherently" and "ma[de] strange noises" [*Id.*]. He also responded to an officer who asked him what he was on by stating "meth" [*Id.*]. The officers did not obtain medical attention for Lewis but instead placed him in another holding cell after cleaning him up [*Id.* at 7–8].

At about 6:06 p.m., Lewis was hitting his head against glass on the cell door [*Id.* at 8]. Accordingly, Doe Defendants placed him in a restraint chair in a padded room [*Id.*]. Lewis again "soiled himself," and, at about 8:30 p.m., officers then took him to the

19

bathroom, changed his clothes, and gave him a glass of water before putting him back in the restraint chair [*Id.*].

At around 10:00 p.m., Doe Defendants reentered Lewis's cell and found he was not breathing [*Id.*]. They did chest compressions and called 911 at 10:38 p.m. [*Id.*]. Lewis was taken to a hospital, where he was placed on life support, but he passed the next morning at 6:23 a.m. due to "acute methamphetamine, fentanyl, xylazine, and morphine intoxication" [*Id.* at 2, 8].

## 2. Municipal Liability Claims Summary

As set forth above, Plaintiff's amended complaint includes three sections of allegations of municipal liability against Knox County [*Id.* at 11–18], which the Court summarizes as follows.

### a. Funding Claims

Plaintiff asserts that before Lewis's death, "it was a common and known hazard that arrestees were being transported to the [Facility] with sufficiently serious medical needs resulting from acute drug withdrawal or overdose" and that the "surge in opiate addiction is well known and documented" [*Id.* at 11]. Also, according to Plaintiff, in 2021, Knox County was involved in "an agreement between state and local governments and the three largest pharmaceutical distributors to resolve investigations and litigation over the companies' roles in creating and fueling the epidemic" [*Id.*]. However, Plaintiff claims that despite their knowledge of the opioid epidemic, Knox County and the Mayor (presumably of Knox County) "failed to address these foreseeable dangers at the [Facility]" even though inmates "have died while in custody from overdose and medical unsupervised

20

detox" [*Id.*]. Also, according to Plaintiff, approximately eight days before the events underlying Lewis's death, Sheriff Spangler "gave a public statement that the opioid epidemic, including detoxing and overdosing, was getting worse and one of the challenges was staffing shortages at the jail," as the staff "was only 50% of where [it] should be and that has put a huge burden on our officers" [*Id.* at 11–12].

Plaintiff further states that the Facility does not satisfy TCI's booking and screening standards, "admits [inmates] who need to be hospitalized," and "has an established custom of placing intoxicated inmates in holding cells where correctional officers do not interact with the inmates except for headcount or removal and essentially allow the inmates to 'sleep it off'" [*Id.* at 12]. Plaintiff also claims that on March 22, 2024, which is approximately 10 months after Lewis's death, a report from the State of Tennessee "found that the [Facility], whose staff are ill-equipped in training, licensing, or other needs to address this opioid issue, was acting like a substitute for proper medical treatment" due to a lack of budgeting for psychiatric care, including inmates suffering from withdrawal [*Id.* at 12–13]. According to Plaintiff, this report found that Knox County's lack of "Medically Monitored Detox Management" resulted in "expensive and costly travel to other regions" for that care [*Id.* at 13].

Plaintiff additionally avers that Knox County's yearly passage of a budget "reveals the value and importance they place on certain projects or individuals in Knox County and should be viewed as moral documents" [*Id.* at 14]. And according to Plaintiff, on an unspecified date, Knox County and the Mayor provided tax incentives and breaks to the County's wealthiest citizens that eliminated approximately $1 billion dollars from the

budget even though these funds "should have been spent to protect the weakest and most vulnerable of Knox County's citizens" [*Id.*].

Plaintiff then asserts that (1) as a pretrial detainee, Lewis had a right to adequate medical care and attention under the Fourteenth Amendment and (2) all jail employees who interacted with Lewis knew he faced an "unjustifiable risk of harm" and needed serious medical attention from a hospital but did not ensure he received that attention "pursuant to Defendant Knox County's custom of delaying meaningful medical screenings and of forcing intoxicated inmates in[]to acute withdrawal without reasonable medical detox or protocol or observation" [*Id.* at 14]. Plaintiff also claims that Knox County's lack of "a mental hospital or drug recovery facility" was an official policy or custom of "deliberately disregarding an obvious or serious medical condition of [Facility] inmates" that led to Lewis's death [*Id.* at 15].

### b.   Overcrowding

Plaintiff next states in relevant part that "Knox County, the Mayor, policymakers[,] and supervisors knew that the [Facility] was overcrowded, putting a strain on officers and staff, as well as supplies, to adequately recognize and treat serious medical conditions, including detoxing inmates" [*Id.*]. According to Plaintiff, this overcrowding (1) was due to the "actions and/or inactions" of "Knox County, the Mayor, supervisors[,] and policymakers," (2) caused the lack of "adequate facilities for medical needs . . . [that was] pursuant to an official policy or longstanding practice or custom of Knox County denying pretrial detainees and similarly situated person appropriate medical attention," and (3) led to Lewis's failure to receive adequate medical attention, suffering, and death [*Id.* at 16].

22

### c. Failure to Train

Plaintiff next claims, among other things, that Tennessee law required a Facility employee to personally observe inmates "at least once every hour on an irregular schedule" and to provide "[more] frequent observation" for intoxicated inmates [*Id.* at 16–17 (quoting Tenn. Comp. R. & Reg. 1400-01-.16(2))]. Plaintiff also asserts that the Facility's written policies and procedures required employees to observe inmates confined in holding or observation cells "with a medical condition, such as withdrawals from drugs or alcohol, every 15–30 minutes" [*Id.* at 17]. Plaintiff then claims that "[b]ased on the surveillance footage, although Mr. Lewis was placed in an observation cell due to his obvious and serious medical condition, the [Facility] officers and staff were not adequately trained on the requirements of the minimum standards or their own written policies and procedures" [*Id.*].

Plaintiff further asserts that (1) "officers, agents[,] and employees of Knox County knew such training would lead to Jail employees or staff disregarding a substantial risk of serious harm and Lewis's health and safety and thereby acted with deliberate indifference to the serious medical needs of Lewis, causing his untimely death"; (2) the lack of training was "pursuant to an official policy or longstanding practice or custom of Defendant Knox County denying pretrial detainees and similarly situated persons appropriate medical attention"; and (3) that this action or inaction of not training Facility "employees to train or treat individuals such as [] Lewis became the official policy and custom and was the moving force behind [] Lewis's death and constitutional injuries" [*Id.* at 17–18]. Plaintiff additionally claims that a lack of training caused Lewis not to receive "an appropriate

23

medical screen" when he entered the Facility, and therefore, no one determined whether "he could be safely housed in the [Facility] given the [Facility's] medical resources or lack thereof to treat or handle inmates with acute medical issues" [*Id.* at 18].

### B. Standard

In deciding a motion to dismiss under Rule 12(b)(6) of the Federal Rules of Civil Procedure for "failure to state a claim upon which relief can be granted[,]" a court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007). This does not require detailed factual allegations, but a party's "obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions[.]" *Id.* at 555 (alterations in original). "[A] formulaic recitation of the elements of a cause of action will not do[,]" nor will "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 555, 557).

Thus, a reviewing court asks whether the complaint contains "factual content that allows [it] to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556). As such, the plaintiff must present facts that permit the court to infer "more than the mere possibility of misconduct[.]" *Id.* at 679. In making this determination, the Court construes the complaint in the light most favorable to the plaintiff and assumes the truth of all well-pleaded factual allegations in the complaint. *See Thurman v. Pfizer, Inc.*, 484 F.3d 855, 859 (6th Cir. 2007). This assumption of truth, however, does not extend to "allegations that are

24

conclusory or require unwarranted inferences based on the alleged facts[,]" *Newberry v. Silverman*, 789 F.3d 636, 640 (6th Cir. 2015), or to a "legal conclusion couched as a factual allegation[.]" *Papasan v. Allain*, 478 U.S. 265, 286 (1986).

As set forth above, Plaintiff's only claims proceeding herein are against Knox County and the individual Defendants in their official capacities, the latter of which are the equivalent of suit against Knox County. *See Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985). And "under § 1983, local governments are responsible only for 'their *own* illegal acts.'" *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (quoting *Pembaur v. Cincinnati*, 475 U.S. 469, 479 (1986)). Accordingly, a plaintiff cannot recover from a municipality "for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978). Instead, a municipality may be liable only where "execution of [its] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury[.]" *Id.*

A plaintiff can plausibly allege that a municipality is liable for her claims under § 1983 based on its custom or policy by setting forth adequate facts to support one of the four following theories:

> (1) the existence of an illegal official policy or legislative enactment;
> (2) that an official with final decision making authority ratified illegal actions;
> (3) the existence of a policy of inadequate training or supervision; or
> (4) the existence of a custom of tolerance or acquiescence of federal rights violations.

*Burgess v. Fischer*, 735 F.3d 462, 478 (6th Cir. 2013) (citation omitted). A plaintiff also may hold a municipality liable for its "inaction" by plausibly alleging the following:

> (1) the existence of a clear and persistent pattern of unconstitutional conduct;

25

(2) notice or constructive notice on the part of the [County];
(3) the [County's] tacit approval of the unconstitutional conduct, such that [its] deliberate indifference in [its] failure to act can be said to amount to an official policy of inaction; and
(4) that the [County's] custom was the "moving force" or direct causal link in the constitutional deprivation.

*Thomas v. City of Chattanooga*, 398 F.3d 426, 429 (6th Cir. 2005) (citing *Doe v. Claiborne Cnty.*, 103 F.3d 495, 508 (6th Cir. 1996)).

To be actionable under § 1983, a municipal custom or policy—whether implicit or explicit—must be "so widespread as to have the force of law[,]" as characterized by the "persistent practices of state officials." *Gregory v. Shelby Cnty.*, 220 F.3d 433, 442 (6th Cir. 2000); *accord Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 167 (1970). And municipal liability claims require a plaintiff to show "an affirmative link between [a municipality's] policy or custom and the particular constitutional violation alleged." *City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823 (1985). Moreover, the Supreme Court has cautioned that, "[w]here a court fails to adhere to rigorous requirements of culpability and causation, municipal liability collapses into *respondeat superior* liability." *Bd. of Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 415 (1997).

**C.     Analysis**

First, the Court liberally construes Plaintiff's amended complaint to assert that Knox County is liable for her claims under *Monell* based on the following allegations: (1) underfunding of the Facility; (2) understaffing; (3) a lack of mental health/withdrawal services for inmates who have overdosed or are intoxicated; (4) a custom under which staff allowed intoxicated inmates to "sleep it off," rather than providing them medical care; (5) overcrowding; and (6) failure to train Facility staff to adequately screen and observe

26

intoxicated inmates. While it appears that Plaintiff may have intended to rely on her Facility underfunding allegations to establish an illegal official policy or legislative enactment that would support most if not all her other allegations of municipal liability, the Court addresses each of these allegations separately for the reasons set forth below.

### 1. Underfunding

Liberally construing the complaint in her favor, Plaintiff alleges that Knox County knew of a region-wide opioid epidemic, knew Facility inmates had died from overdoses and medically unsupervised detoxes, and knew the Facility needed more staff but passed a budget that provided tax incentives and breaks to its wealthiest citizens rather than more funding for the Facility, which she at least implies caused the Facility to have a shortage of staff, a lack of adequate mental health and withdrawal care for intoxicated inmates, a policy of inadequate medical screening, a custom of having intoxicated inmates "sleep it off," overcrowding, and a lack of proper employee training [Doc. 10, pp. 11–18]. But Plaintiff does not support this general allegation of Facility underfunding with any facts, such as what funds Knox County directed toward the Facility in the fiscal year underlying the amended complaint, how much funding other similar facilities received in the relevant year, or any other facts from which the Court could plausibly infer that Knox County's budget decision for the Facility amounted to an illegal official policy or enactment. Nor does Plaintiff alleges facts about the number of injuries or deaths from overdoses or medically unsupervised detoxes in the Facility during the relevant timeframe or the facts underlying those alleged incidents that would permit a plausible inference that Knox County policymakers knew or should have known that its budgeting choices, staffing

27

levels, lack of onsite psychiatric or withdrawal care, "sleep it off" custom, inmate population levels, or employee training would result in constitutional violations but acted recklessly or deliberately in the face of those risks.

And while Plaintiff strongly implies, and makes some conclusory and general allegations, that a lack of adequate funding led to the Facility's alleged understaffing, lack of mental health/detox services for inmates, lack of adequate medical screening for intoxicated inmates, "sleep it off" custom, overcrowding, and/or lack of adequate training, she does not set forth any facts to support a plausible inference that the underfunding of the Facility actually caused these other alleged conditions. *Caraway v. CoreCivic of Tenn., LLC*, 98 F.4th 679, 686 (6th Cir. 2024) (finding that where "[t]he complaint contain[ed] only generalized allegations that [the prison's] understaffing 'led to' rampant drug use, apparently in part because officials couldn't perform adequate head counts and inspections," that allegation was conclusory and unsupported by facts and therefore "receive[d] no presumption of truth").

Accordingly, to the extent Plaintiff alleges a standalone *Monell* claim based on her allegation that Knox County did not adequately fund the Facility, this allegation fails to state a plausible municipal liability claim under § 1983, and it is **DISMISSED**. Additionally, as Plaintiff's Facility underfunding allegations are conclusory, they do not plausibly allege an illegal official policy or legislative enactment on which she can rely for her remaining municipal liability claims, which the Court will now address separately.

### 2. Understaffing

Plaintiff states in her amended complaint that, eight days before Lewis's confinement in the Facility, Sheriff Spangler "gave a public statement that the opioid epidemic, including detoxing and overdosing, was getting worse and one of the challenges was staffing shortages at the jail," as the staff "was only 50% of where [it] should be and that has put a huge burden on our officers" [*Id.* at 11–12]. Plaintiff therefore states that Knox County should have provided more funds to hire additional staff [*Id.* at 12].

However, Plaintiff does not set forth any facts to support a plausible inference that Knox County may be liable under § 1983 for its "inaction" in failing to hire more staff based on Sheriff Spangler's statement, such as "a clear and persistent pattern of unconstitutional conduct" of which Knox County was aware and tacitly approved. *Thomas*, 398 F.3d at 429. While Plaintiff does allege that overdoses and "medically unsupervised detox" resulted in inmates dying in the Facility on unspecified dates, she does not set forth any facts about these incidents from which the Court can find that they resulted from unconstitutional conduct related to understaffing, or that any policymaker of Knox County knew of and explicitly or implicitly approved unconstitutional conduct surrounding such incidents.

### 3. Mental Health/Withdrawal Services

Plaintiff next claims that Knox County's failure to have adequate psychiatric care and/or "withdrawal management care" in the Facility meant that it had to provide inmates needing such care "extensive and costly travel to other regions" in a manner that put a financial "and personal burden on law enforcement" [*Id.* at 13]. Again, however, while

29

Plaintiff implies that Knox County should have created a more convenient psychiatric and "withdrawal management" program for Facility inmates, Plaintiff does not set forth any facts to support a plausible inference that Knox County is liable under § 1983 for its "inaction" in failing to do so, such as "a clear and persistent pattern of unconstitutional conduct" related to this omission of which Knox County was aware and tacitly approved. *Id.* And Plaintiff's conclusory reference to other overdose or medically unsupervised detox deaths is insufficient, as she does not provide any facts about those deaths that support a plausible inference that they were due to unconstitutional conduct that any Knox County policymaker tacitly approved.

### 4. Medical Screening

Plaintiff next claims that Knox County had customs or policies under which Facility staff did not adequately medically screen inmates upon their entry to the Facility and instead allowed intoxicated inmates to "sleep it off," rather than providing them medical care [*Id.* at 12]. But Plaintiff does not allege or set forth any facts upon which to conclude that these customs or policies were based on an illegal official policy or legislative enactment. Nor does she set forth any facts suggesting that any Knox County policymaker knew of and ratified these practices, or that Knox County knew of and tolerated constitutional violations due to inadequate medical screening or the "sleep it off" custom prior to Lewis's death. Thus, Plaintiff has not stated a plausible *Monell* claim based on a lack of medical screening/the "sleep it off" custom under the first, second, or fourth *Burgess* theories set forth above. And the Court will address Plaintiff's allegations in her

amended complaint that the lack of proper medical screening was due to failure to train under the third *Burgess* factor below with Plaintiff's other failure to train claim.

### 5. Overcrowding

Plaintiff's allegations of overcrowding are likewise wholly conclusory and fail to allow the Court to plausible allege that the Facility was overcrowded at the time of the events underlying the amended complaint, much less that this overcrowding caused any violation of Lewis's constitutional rights. Specifically, Plaintiff provides no facts about how many inmates were in the Facility at the time of the events underlying the amended complaint, or how many inmates the Facility is meant to hold. Moreover, even if the Court assumes the Facility was overcrowded at the time of the events underlying the amended complaint, this overcrowding, standing alone, is not a constitutional violation. *Agramonte v. Shartle*, 491 F. App'x 557, 560 (6th Cir. 2012).

And while Plaintiff makes general assertions that overcrowding caused a strain on the Facility's staff and supplies and that Lewis did not receive medical attention, she does not attempt to connect these separate conclusory allegations with any facts [*Id.* at 15–16]. Nor does Plaintiff set forth any specific facts to support a plausible inference (1) that the overcrowding was due to an illegal official policy or legislative enactment; (2) that a policymaker knew of the alleged overcrowding; (3) that the overcrowding was due to a failure to train or supervise; or (4) that Knox County knew of and tolerated other unconstitutional violations due to overcrowding prior to Lewis's death.

31

### 6. Failure to Train

The amended complaint also alleges that Facility officers and staff were not adequately trained regarding (1) TCI and Knox County's own policies requiring observation of pretrial detainees, including intoxicated inmates and inmates with other medical issues; and (2) medical screening of intoxicated inmates [Doc. 10, pp. 17–18]. In setting forth this claim, Plaintiff specifies that her allegation that Knox County failed to adequately train its employees regarding observation of inmates is "[b]ased on the surveillance footage" of Lewis [*Id.* at 17] before generally asserting that Knox County (1) knew its lack of training would result in a violation of Lewis's constitutional rights and (2) was deliberately indifferent to Lewis's serious medical needs [*Id.* at 17]. Plaintiff further states that Knox County's lack of and/or inadequate training on "recogniz[ing] and/or treat[ing] individuals such as [] Lewis became the official policy and custom and was the moving force behind his death and constitutional injuries" [*Id.* at 18]. According to Plaintiff, Knox County's lack of training regarding medical screening caused Lewis not to "receive an appropriate medical screen" or a determination of whether he could be housed in the facility and his death, and this lack of training was based on Knox County's official policy or "longstanding practice or custom of denying pretrial detainees and similarly situated persons appropriate medical attention" [*Id.*].

Notably, however, even Plaintiff states that she is unsure whether a failure to train or the indifference of Facility employees caused the Facility's employees to fail to address the risks to Lewis during his confinement [*Id.* at 6 (stating that "whether due to inadequate training, lack of supervision, or sheer indifference, Defendant John Doe 1, Defendant John

32

Doe 2, Defendant Jane Doe 1, Defendant Jane Doe 2, and all other correctional officers and medical personnel interacting with Lewis failed to take any reasonable measure to abate the risks. Instead, they locked Lewis in a holding cell for 'observation,' then turned a blind eye to what was to follow")]. Nevertheless, the Court will now examine whether Plaintiff's allegations in her amended complaint about Knox County's failure to train its employees plausibly allege a *Monell* claim.

A municipality may be liable under § 1983 for a failure to adequately train its employees where that failure amounts to deliberate indifference to the rights of the county's inhabitants. *City of Canton v. Harris*, 489 U.S. 378, 390 (1989). "To succeed on a failure-to-train claim, a plaintiff must show: '(1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury.'" *Howell v. NaphCare, Inc.*, 67 F.4th 302, 319 (6th Cir. 2023) (citing *Ellis ex rel. Pendergrass v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006)). To meet the deliberate indifference requirement, a claimant must set forth factual allegations indicating that the municipal actor had "actual or constructive notice that a particular omission in their training program cause[d] . . . employees to violate citizens' constitutional rights." *Connick*, 563 U.S. at 61 (citing *Brown*, 520 U.S. at 407).

"A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train[,]" *Connick*, 563 U.S. at 61, because an "officer's shortcomings may have resulted from factors other than a faulty training program." *City of Canton,* 489 U.S. at 390–91. Moreover, it is not sufficient for a § 1983 plaintiff to show

that more or better municipal training could have prevented his injury. *Id*. Rather, to support a claim that a municipality's failure to train or supervise is the result of deliberate indifference, a plaintiff must plausibly allege either (1) a "pattern of similar constitutional violations by untrained employees" or (2) "a single violation of federal rights, accompanied by a showing that [the municipality] has failed to train its employees to handle recurring situations presenting an obvious potential for a constitutional violation." *Shadrick v. Hopkins Cnty.*, 805 F.3d 724, 738–39 (6th Cir. 2015) (internal quotation marks and citations omitted).

However, Plaintiff's amended complaint contains no factual allegations (1) about the training Knox County provides employees regarding observation of inmates or medical screenings, or (2) indicating that Knox County had notice of prior constitutional violations arising out of observation of inmates or medical screenings that put it on notice of any deficiency in its training on these issues. *Stemler v. City of Florence*, 126 F.3d 856, 865 (6th Cir. 1997) (providing that to succeed under a failure to train theory, a plaintiff generally must establish that "the municipality was aware of prior unconstitutional actions of its employees and failed to respond"). Instead, Plaintiff sets forth only conclusory allegations that Knox County inadequately trained Facility employees and could have prevented Lewis's injuries and death with better training. But such allegations are insufficient to state a plausible claim for deliberate indifference. *See, e.g. Harvey v. Campbell Cnty.*, 453 F. App'x 557, 563 (6th Cir. 2011).

And while the amended complaint claims Facility staff violated the TCI and Knox County's policies, this allegation does not sufficiently allege a constitutional violation,

34

much less an incident for which Knox County may be liable under § 1983. *Napper v. Hankison*, 617 F. Supp. 3d 703, 745–46 (W.D. Ky. 2022) ("[W]hile standard operating procedures may of course call for a higher or different standard of care than does the Constitution, that does not supplant the Constitution as the source of legal liability under § 1983.").

For all these reasons, the Court finds Plaintiff has failed to present adequate facts to state plausible *Monell* claims as to Knox County. *See, e.g., Massey v. CoreCivic, Inc.*, No. 23-5865, 2024 WL 3086518, *2 (6th Cir. June 21, 2024) ("Thus, [the plaintiff] failed to state a claim and was not entitled to discovery. Under the pleaded facts, poor training or staffing or another unlawful [] policy might have caused [the decedent's] death. But it is also possible that an employee's negligence was to blame—or that [the decedent] would have died even if [the defendant's] personnel did nothing wrong."). As such, Defendants' motion to dismiss [Doc. 12] will be **GRANTED**.

### 7. John/Jane Does

Although not raised by either Party, the Court notes that, to date, Plaintiff has never identified or served any of the John/Jane Doe Defendants. And the statute of limitations against these Defendants has run.

The forum state's relevant statute of limitations applies in federal court § 1983 actions. *See Wallace v. Kato*, 549 U.S. 384, 387 (2007). In Tennessee, that period is one year. *Foster v. State*, 150 S.W.3d 166, 168 (Tenn. Ct. App. 2004) (applying the one-year statute of limitations from Tenn. Code Ann. § 28-3-104 in a § 1983 claim). As the events underlying her amended complaint occurred on May 25, 2023, Plaintiff's § 1983 causes of

35

action accrued no later than May 27, 2024 [*See* Doc. 10]. Accordingly, Plaintiff may not now update her amended complaint to name the John/Jane Doe Defendants, and the Court will therefore dismiss these Defendants. *See Cox v. Treadway*, 75 F.3d 230, 240 (6th Cir. 1996) (holding filing of a complaint against John Doe defendants does not toll running of statute of limitations against those parties); *see also* Fed. R. Civ. P. 21 (providing "[o]n motion or on its own, the court may, at any time, on just terms, add or drop a party").

### 8. State-Law Claims

Because the Court dismisses Plaintiff's federal claims, the Court will exercise its discretion to decline to exercise supplemental jurisdiction over Plaintiff's negligence and negligence per se state-law claims by dismissing these claims without prejudice. 28 U.S.C. § 1367(c)(3); *United Mine Workers of Am. v. Gibbs,* 383 U.S. 715, 726–27 (1966) ("[I]f the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.").

## IV. CONCLUSION

For the reasons set forth above:

1. Plaintiff's claim(s) in her amended complaint against the named Defendants in their individual capacities are **DISMISSED without prejudice**;

2. Defendant Knox County's motion for leave [Doc. 31] is **GRANTED**;

3. Defendant Knox County's motion to enforce the stipulation and agreement [Doc. 32] is **DENIED as moot**;

4. Defendant Knox County's motion for sanctions [Doc. 39] is **DENIED**;

5. Plaintiff's unopposed motion for extension [Doc. 41] is **GRANTED**;

6. Plaintiff's motion to dismiss the individual Defendants without prejudice [Doc.

36

44] is **DENIED as moot**;

7. Defendant Knox County's motion to dismiss Plaintiff's federal claims under Rule 12(b)(6) [Doc. 12] is **GRANTED**;

8. Defendant Knox County's motion to stay discovery pending disposition of the motion to dismiss [Doc. 22] is **DENIED as moot**;

9. Plaintiff's claims against the John/Jane Doe Defendants are **DISMISSED**; and

10. Plaintiff's state-law claims are **DISMISSED without prejudice**.

**AN APPROPRIATE JUDGMENT ORDER WILL ENTER.**

s/ Thomas A. Varlan
UNITED STATES DISTRICT JUDGE